UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Kimberly J. Belzer, | ) | Case No. 5:08CV3028 |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | [Resolves Doc. 31] |
| Akron General Medical Center, | ) | |
| | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant. | ) | |

This matter is before the Court upon a motion for summary judgment filed by Akron General Medical Center ("AGMC").  For the reasons stated herein, the motion is GRANTED.

I.  **Facts**

The underlying facts relevant to disposition of this matter are largely undisputed. Plaintiff Kimberly Belzer began her employment as a registered nurse with AGMC in 1982.  She served in the hospital's labor and delivery unit throughout her employment.  For a vast majority of her employment, Belzer had few, if any, complaints about her work.  However, her interpersonal skills were often found to need improvement during year-end reviews and eventually resulted in discipline.

On February 26, 2006, Belzer received pre-disciplinary counseling as a result of a patient reporting that Belzer had stated to her, "If you want to lay (sic) on your back and stop all oxygen flow to your baby, go ahead."  Belzer admitted to making a statement of this nature, but did not believe it had been properly interpreted by the patient.  Belzer's discipline continued when she received a written warning on December 6, 2006.  The written warning stemmed from an

1

incident on October 31, 2006 that led to a letter of complaint from a resident physician, Dr. Anhtuan Huynh.  Dr. Huynh indicated that Belzer had not followed his orders to increase the dose of Pitocin for a patient and that Belzer asked him why he was "in such a hurry."  Dr. Huynh also indicated that Belzer told him several times that she would make his "life miserable."  After an investigation by Belzer's supervisor, Judy Ezzie, it was determined that a written warning was appropriate.

On February 27, 2008, Belzer received a final written warning based upon two complaints from patients.  On February 5, 2008, a patient complained that she had been admitted to triage and that Belzer had been "rude and nasty" during her interaction.  The patient claimed that she could later overhear Belzer laughing and making fun of her with other nurses.  The second complaint was contained in a letter dated February 1, 2008.  The underlying incident, however, occurred in 2005.  The letter indicated that the patient had recently delivered her second child and that the difference between her treatment during her first and second labor and delivery compelled her to write about her first experience.  In so doing, the patient noted that "[t]he labor and delivery of my first child at Akron General in 2005 was the absolute worst experience of my life."  During her stay, the patient broke down into tears, only to have Belzer tell her that she was "potentially harming the baby" because she "was overstressed."  The patient continued as follows:

> When I adjusted the monitors on my belly as they were digging into my skin, I was informed that [Belzer] could not possibly get a good reading now and if my baby was suffering, it was my fault.  At some point, my husband disagreed with her, and she threatened to leave us on our own.
>
> …
>
> In my opinion, she was just downright cruel, taking advantage of me in a weakened state to make me feel horrible about myself, my pain, and my family.

2

Ezzie investigated both of these complaints, including interviewing the patients at issue.  Based upon her review, Ezzie found that a final written warning was appropriate.

On March 27, 2008, Ezzie met with Belzer to discuss her lack of progress since the final written warning.  At that time, Ezzie informed Belzer that she had received negative feedback during the preceding month from several other labor and delivery nurses, patients, and resident physicians.  The following day, Clinical Manager Carrie Corbett received a complaint from a vendor, Tina Kisling.  Kisling described Belzer as "rude and condescending."  Kisling also felt as though Belzer had unjustifiably questioned her knowledge about certain topics and her nursing practices.  The complaint was forwarded on to Ezzie who in turn spoke to Belzer.  Belzer did not deny a majority of the conduct alleged by Kisling.  As a result, AGMC decided to place Belzer on a Last Chance Agreement for one year.  Belzer signed the Agreement on April 2, 2008.

On May 13, 2008, two resident physicians, Dr. Byler and Dr. Anagnostou, complained to Ezzie that Belzer had engaged in inappropriate and unprofessional conduct.  Both doctors indicated that Belzer spoke to them in a condescending manner and attempted to be difficult with them while also attempting to influence a patient's family.  On May 14, 2008, both doctors signed a report containing these allegations.  On May 16, 2008, Ezzie summoned Belzer to a meeting and terminated her employment.  Thereafter, Belzer filed a grievance to challenge her termination.  AGMC denied the grievance at the third step and Belzer's union appealed.  Upon further investigation, the union withdrew its appeal and request for arbitration.  Belzer was informed of her right to appeal the union's decision, but took no appeal.

3

On November 20, 2008, Belzer filed this action in state court.  The matter was removed here with AGMC claiming that Section 301 of the Labor Management Relations Act supported removal.  As detailed below, the complaint includes causes of action for age discrimination, disability discrimination, retaliation, hostile work environment, and intentional infliction of emotional distress.  AGMC has moved for summary judgment on each claim.  The briefing has concluded, and the matter now appears before the Court.

## II.  Legal Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The initial burden of proving the absence of any "genuine issues" is borne by the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.*  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determining whether a factual issue is "genuine" requires considering the applicable evidentiary burdens.  *Id.* at 252.  Moreover, when deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party.  *Matsushito Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party.  The non-moving party may not simply rely on its pleadings; rather, it must

4

"produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  Moreover, Fed. R. Civ. P. 56(e)(2) states:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Accordingly, summary judgment analysis examines whether a trial is necessary and judgment is therefore appropriate when there are no genuine issues of material fact.  *Anderson*, 477 U.S. at 250.

### III. **Legal Analysis**

Initially, the Court notes that Belzer has challenged this Court's jurisdiction.  In her brief, Belzer contends that she did not "plead or in any manner invoke a collective bargaining agreement as a basis for her claims."  This statement is in stark contrast to earlier portions of the *same* brief.  When giving the factual history of this matter, Belzer's brief states as follows:

> Certain sections of the Collective Bargaining Agreement between AGMC and the Ohio Nurses Association ("ONA") (hereinafter "CBA") are pertinent to the disciplinary actions taken by AGMC against ONA member Belzer, but only because AGMC failed to follow its own obligatory policies and procedures for discipline.

Furthermore, it is clear that at least a portion of Belzer's argument regarding pretext focuses upon the fact that progressive discipline was not implemented properly under the CBA.  As such, the Court finds that the matter was properly removed here.

Furthermore, the fact that the Court has chosen to address each claim on the merits should not be taken as evidence that AGMC's preemption arguments were not well taken.

5

Rather, as Belzer falls short on the merits of each of her claims, the Court found it unnecessary to resolve the issue of preemption.

     A.  <u>Age Discrimination</u>

In the first count of her complaint, Belzer contends that her termination was the result of age discrimination.  The Court finds that summary judgment is appropriate on this claim.

Ohio Rev. Code § 4112.14(A) makes it unlawful for an employer to discriminate against any job applicant "aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee." Age discrimination claims brought under Ohio law are analyzed under the same standards as federal claims brought under the Age Discrimination in Employment Act ("ADEA").  *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) (citation omitted).  Under the ADEA, a plaintiff may demonstrate age discrimination by presenting either direct or indirect (circumstantial) evidence. *Smith v. Chrysler Corp*., 155 F.3d 799, 805 (6th Cir. 1998). Moreover, under the *McDonnell Douglas* burden-shifting framework "[t]he burden is first on the plaintiff to demonstrate a prima facie case of [ ] discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted).  To establish a *prima facie* case of age discrimination based on wrongful termination, Belzer is required to demonstrate that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was replaced by someone outside of the protected class.  *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009).

6

1. <u>Direct Evidence</u>

Belzer first contends that summary judgment is inappropriate because she has offered direct evidence of age discrimination.  The Court finds no merit in this contention.

Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007) (overruled on other grounds) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). For example, comments "from the lips" of the employer "proclaiming his or her ... animus" constitute direct evidence of discrimination. *Smith*, 155 F.3d at 805 (citation omitted). S*ee also Coburn v. Rockwell Automation*, *Inc.*, 238 Fed. Appx. 112, 116 (6th Cir. 2007) (stating that "direct evidence is found ... where a statement by an employer directly shows there is a discriminatory motive.") (quoting *Olive v. Columbia/HCA Healthcare Corp.*, 2000 WL 263261 (Ohio Ct. App. 2000)). The statement must not be "isolated, ambiguous, or abstract" and must be a remark "by the employer." *Coburn*, 238 Fed. Appx. at 117-18 (quoting *Hoyt v. Nationwide Mut. Ins. Co*., 2005 WL 3220192 (Ohio Ct. App. 2005)). A discriminatory comment is attributable to the employer when it is made by a "decision maker." *Id.* at 118 (noting the "vital difference" between discriminatory statements by corporate decision makers and "stray remarks" by personnel who are unrelated to the decision making process) (quotation omitted).

While Belzer claims that she has provided direct evidence of age discrimination, the sum total of her argument on this issue consists of one unsupported statement that describes AGMC as a "well-known, derogatory[] workplace" filled with "comments and conduct regarding older and disabled workers[.]"  Belzer then refers to the affidavits of Lori Wykoff and Wendy Bishop. While Belzer has failed to identify any specific portion of either affidavit, a review of both in their entirety reveals no direct evidence of discrimination.  Instead, the focus of both affidavits is

7

on alleged comments made by younger nurses at AGMC.   These affidavits describe an atmosphere where the younger nurses and older nurses are often in conflict, with Wykoff and Bishop asserting that the younger nurses routinely made age-related comments.   These affidavits offer no support for Belzer's claim for two reasons.   First, the affidavits do not attribute any comments to anyone that could be considered a decision maker.   As such, they cannot be considered direct evidence of discrimination.   Second, the affidavits are written in such a broad fashion that they rarely include any details about the alleged person making the comments, the specific content of the comments, or the time frame in which the comments were made. As such, they add little to nothing to the Court's analysis.

While not argued in her brief in opposition, Belzer does make reference to a comment made by a decision maker, specifically a comment made by Ezzie.   Belzer contends that Ezzie once told her that "bedside nursing is obsolete."   Construing the evidence in a light most favorable to Belzer, this comment contains no age-based animus.   Assuming arguendo that Ezzie made the comment, it in no manner indicates any ill feeling toward older individuals.   Instead, it is a comment about the field of nursing and how it has changed over time.   Accordingly, it offers no support for a claim of age discrimination.

2.  Indirect Evidence

Belzer cannot establish a genuine issue of material fact on her age discrimination under the indirect evidence standard because she cannot demonstrate a *prima facie* case under the *McDonnell Douglas* framework.   While there is no dispute that Belzer satisfies the first three prongs, she is in a protected class, was terminated, and was qualified, she cannot satisfy the fourth prong.

8

Belzer first contends that she was replaced by someone, Heather Smith, outside of the protected class.  In support, Belzer relies again on the Wykoff affidavit along with Ezzie's deposition.  Neither document supports her claim.

Wykoff's affidavit indicates that Smith "moved to the day shift" after Belzer was terminated. Ezzie's deposition makes it clear that she felt that Belzer was qualified for her job, but makes no mention of her replacement.  The affidavit of Donald Corpora, the Director of Employee/Labor Relations at AGMC, confirms what the Court can infer from Wykoff's affidavit: "AGMC did not fill the position left open by Ms. Belzer.  Her job responsibilities were assumed by the remaining RNs in the Labor and Delivery unit."

> [A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990) (citing *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir. 1980)); *see also Lilley v. BTM Corp*., 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement.").  As the sole evidence before the Court indicates that Belzer was not replaced, she cannot use such a theory to demonstrate a *prima facie* case of discrimination.

While Belzer could also rely upon evidence that similarly situated nurses were treated differently, she has not made such an argument at any time during these proceedings.[1]

---

[1] Belzer has at times made conclusory statements that other younger nurses were not disciplined for similar workplace violations.  However, her brief contains no specific facts or an analysis that would support such a conclusion.

9

Accordingly, the Court will not conduct such an analysis.  The Court does note that AGMC's argument on this issue would be well taken if the Court were to reach the issue.

Based upon the above, it is clear that Belzer's age discrimination must fail as a matter of law.  Summary judgment, therefore, is appropriate on this claim.

B.  Handicap/Disability Discrimination

With respect to her handicap and/or disability discrimination claims, Belzer continues her same pattern of argument.  She broadly alleges any number of facts, but offers no evidence in support of any of her conclusions.  Upon review, summary judgment is appropriate on her claims of handicap and disability discrimination.

To succeed on her disability discrimination claim, Belzer must show that: (1) she was "disabled" under the ADA; (2) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodations; (3) she suffered an adverse employment action; (4) AGMC knew or had reason to know of her disability or perceived; and (5) a non-disabled person replaced her.  *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). To qualify as "disabled" under the ADA, "an individual must (1) have a physical or mental impairment which 'substantially limits' him or her in at least one 'major life activity,' (2) have a record of such an impairment, or (3) be regarded as having such an impairment." *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (citing 42 U .S.C. § 12102(2)).[2]

_____

[2] As detailed below, Belzer falls well short of surviving summary judgment on these claims.  As such, any minor distinctions in definitions and burdens under Ohio law do not affect the Court's ultimate conclusion.

10

While not clear from the briefing, it appears that Belzer has abandoned any claim of having an actual disability.  Instead, she claims that AGMC *perceived* her as disabled.

> An employee is "regarded as" disabled under the ADA if his employer (1) mistakenly believes that he has a physical impairment that substantially limits one or more major life activities, or (2) mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

*Simpson v. Vanderbilt Univ.*, 2009 WL 4981684, at *5 (6th Cir. 2009) (citing *Mahon*, 295 F.3d at 592).  In this regard, Belzer asserts that numerous nurses reported to Ezzie that Belzer was "bipolar."  This argument, however, is insufficient to withstand summary judgment.

It is undisputed that Ezzie received comments from three different nurses that labeled Belzer as bipolar.  Ezzie, however, expressly discounted these statements, asserting that the nurses were merely venting their frustrations.  On numerous occasions during her deposition, Ezzie candidly admitted that Belzer was an extremely competent nurse and that Ezzie had no concerns about her ability to remain a nurse. "That the defendants were aware of [the plaintiff's] health issues does not support a conclusion that they misperceived [her] physical abilities as impaired and affecting her performance."  *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 568 (6th Cir. 2009); *see also Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001) ("It is not enough ... that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." (quoting *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998))).

Herein, there is no evidence to suggest that AGMC ever perceived Belzer as disabled. Belzer's arguments in this regard border on frivolous.  Belzer appears to contend that since three nurses described her as bipolar and she was later terminated, she has somehow satisfied her

11

*prima facie* case of discrimination.  As noted above, Belzer has failed to demonstrate that AGMC perceived her as disabled.  Moreover, she has offered no evidence of any kind that would support even an inference that her disability played a role in her termination.  As such, summary judgment on the disability and handicap discrimination claims is appropriate.

    C.  Hostile Work Environment

Belzer also contends that she was subjected to a hostile work environment.  The Court finds no merit in this contention.

Belzer may establish a violation of Title VII by demonstrating that discrimination based on sex or disability created a hostile or abusive working environment.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Williams v. Gen. Motors Corp*., 187 F.3d 553, 560 (6th Cir. 1999).  To establish her hostile environment claim, Belzer must provide sufficient evidence to show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex or disability; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability.  *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (setting forth the analogous elements of racial discrimination).

Similar to the above, Belzer's claim does not approach the standard necessary to survive summary judgment.  Belzer's argument here again appears to rely on a "throw everything at the wall and see what sticks" approach.  Nowhere in her argument does Belzer identify any discrete actions or statements that support her claim.  Instead, Belzer summarily concludes that her work atmosphere was filled with "verbal abuse and ridicule of older (over 40) nurses, chronic denial of certain job benefits…, open ridicule of disabled nurses," and a complete failure by management to correct these problems.  By offering no specific instances, Belzer has doomed her claim.

12

A hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that are sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).   The conduct complained of must be both severe and pervasive enough to create an environment that a reasonable person would find hostile or abusive and the plaintiff must subjectively regard that environment as abusive.  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).  In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court must consider the totality of the circumstances. *Williams*, 187 F.3d at 562.  Appropriate factors for a court to consider include the frequency of the alleged discriminatory conduct; its severity; whether the conduct is physically threatening or humiliating or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance.  *Bowman*, 220 F.3d at 463.  The conduct must be sufficiently extreme to amount to a change in the terms and conditions of employment.  *Lovelace v. BP Prod. N. Am., Inc.*, 252 Fed. Appx. 33, 40 (6th Cir. 2007).  "[M]ere utterance of an … epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII."  *Harris*, 510 U.S. at 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 67).

By not identifying the specific instances of alleged harassment, Belzer has made it impossible for this Court to find that she was subjected to a hostile work environment.  That says nothing about the fact that Belzer candidly admitted that she had not reported many of the instances of conduct that occurred.  For example, Belzer argues that one doctor made a comment similar to "oh, you older girls."  Belzer did not report this comment to management, nor is it clear how such a benign statement could create a hostile work environment.

One thing is clear from the briefing in this matter:  the older and younger nurses in this particular unit in AGMC did not always get along.  The older nurses focus more on bedside nursing, while the younger nurses apparently rely more heavily upon technology to manage their patients.  As a result, there are often disagreements between those nurses and certain cliques have developed.  However, Belzer has, at best, identified that younger nurses made stray remarks on a few isolated occasions about her mental stability and physical ability.  There is simply no evidence that those comments were severe or pervasive, nor is there any evidence that AGMC knew of should have known of any hostile work environment.  Summary judgment, therefore, is appropriate on Belzer's hostile work environment claim.

D.  Retaliation

Belzer's complaint also contains a claim for retaliation.  This claim likewise fails.

A plaintiff alleging retaliatory discharge must prove the following: "(1) that she engaged in protected activity; (2) that she was the subject of adverse employment action; and (3) that a causal link existed between the protected activity and the adverse action."  *Chandler v. Empire Chem., Inc.*, 650 N.E.2d 950, 954 (Ohio Ct. App. 1994) (citing *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984)).  Federal law has adopted the *McDonnell Douglas* burden-shifting framework in retaliation cases, in which the plaintiff must first make out a prima facie case of discrimination.  *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).  The burden then shifts to the defendant to give a legitimate, non-discriminatory explanation for its actions regarding the plaintiff. *Id.* If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered explanation is pretextual. *Id.*

14

Much like her hostile work environment claim, Belzer's argument with respect to this claim is broad, vague, and ambiguous.  Belzer concludes that she made numerous complaints to Ezzie about any number of issues.  In the argument portion of her brief, Belzer does not identify the topic of any of these complaints, nor does she identify when the complaints were made.  This is problematic because retaliation claims are not generated in all instances when workplace complaints have been made.

> Title VII protects employees from retaliation for having opposed an employer's unlawful actions. A plaintiff must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII. An employee has engaged in opposing activity when she complains about unlawful practices to a manager, the union, or other employees.

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (citations omitted).  Thus, for example, Belzer's alleged complaints about the younger nurses relying too much on monitoring equipment cannot support a claim for retaliation.

Assuming *arguendo* that there is some protected activity buried in the brief filed by Belzer, her claim still must fail.  While Belzer mentions case law regarding "temporal proximity" and "logical nexus," she has supplied no evidence that would cause the Court to apply either of those theories to her case.  There is no evidence of any kind to support that there is a causal link between any of Belzer's complaints and any of her discipline.  Her retaliation claim, therefore, must fail.

E.  Legitimate Reason, Pretext

The Court notes that even if Belzer had met her *prima facie* case for age discrimination, disability discrimination, or retaliation, this Court would still enter summary judgment in favor of AGMC.

It is beyond question that AGMC offered a legitimate reason for Belzer's termination. AGMC has offered evidence that it received numerous complaints about Belzer's workplace attitude and performance between February and May 2008, when she was terminated.  These complaints came from at least one current patient, a former patient, three nurses, and several doctors.  While Belzer may not agree with the views held by these individuals, there is no dispute that these complaints were made to AGMC, they were investigated by Ezzie, and discipline was progressively increased after each incident.

Furthermore, Belzer has offered no evidence of pretext.  In this regard, Belzer appears to focus upon her claim that Ezzie relied upon the statements of the younger nurses in making the decision to terminate her.  Belzer's statements appear to deliberately misconstrue Ezzie's testimony.  Ezzie admitted receiving comments about Belzer's mental health from three other nurses.  Ezzie also made it clear that these statements played no role in Belzer's discipline. Rather, she informed Belzer of these general comments from both the nurses and other co-workers *prior* to Belzer's termination in an effort to assist Belzer in avoiding discipline. Accordingly, there is no evidence to support a claim that AGMC's stated reason for Belzer's termination was pretextual.  As such, these grounds would also support summary judgment in AGMC's favor on the age and disability discrimination claims and the retaliation claim.

F.   Intentional Infliction of Emotional Distress

Finally, Belzer maintains that her claim of intentional infliction of emotional distress should survive summary judgment.  The Court disagrees.

To establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme

16

and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure. *Ashcroft v. Mt. Sinai Med. Ctr.*, 68 Ohio App.3d 359, 366 (Ohio Ct. App. 1990).  It is the rare case that reaches the very high bar of showing "extreme and outrageous" conduct. "Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 72 Ohio App.3d 417, 423 (Ohio Ct. App. 1971).

The Court summarily addresses this claim.  The Court has thoroughly reviewed the record, despite Belzer's summary disposition of this matter in her brief.  There is nothing in the record to demonstrate any extreme and outrageous conduct.  In a light most favorable to Belzer, she has demonstrated that the younger nurses do not like her and have made that fact known. Such facts do not support a claim for intentional infliction of emotional distress.

G.  Summary

Based upon the above, the Court has found that each claim in the complaint is subject to summary judgment.  Moreover, the Court notes that Belzer's brief in this matter was remarkably similar in its layout to the complaint that the Court took issue with in this matter.  See Doc. 4. Belzer effectively includes every conceivable fact, even misconstruing some of the evidence, and places in it the brief.  The argument section then includes numerous case citations on any number of legal theories, even those only tangentially related to this fact scenario.   Within that section, there is little effort made to connect the facts of this matter to applicable law.  Instead, Belzer's counsel takes a scattershot approach and hopes that if enough information and law are contained in the brief that something will be successful in surviving summary judgment.  The problems

with the brief are only compounded by the fact that the brief does not comply with Local Rule 7.1, as it contains no table of contents, nor any table of citations.  Despite the jumbled nature of the brief, the Court is confident that it has addressed all of the issues in this matter.

IV. **Conclusion**

Based upon the reasons stated herein, AGMC's motion for summary judgment is GRANTED.  The complaint is DISMISSED.

IT IS SO ORDERED.


_March 18, 2010_____                    ___/s/ John R. Adams_____
Date                                            JOHN R. ADAMS
                                                UNITED STATES DISTRICT JUDGE

18